# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# JASPER DIVISION

TERRY BENTON,           )
                             )
       Plaintiff,        )
                             )
v.                         )    Case No.:  6:17-cv-00384-JHE
                             )
WALKER COUNTY, ALABAMA, et al.,    )
                             )
       Defendants.     )

## MEMORANDUM OPINION AND ORDER[1]

Plaintiff Terry Benton brings this action for violation of his civil rights pursuant to 42 U.S.C. § 1983.  (Doc. 3-3).  After the undersigned ruled on a motion for partial dismissal, the following claims remain: (1) a § 1983 Failure to Protect Claim against Officer Nicholas Harbin in his individual capacity; (2) § 1983 Failure to Protect Claim Against Sheriff Underwood in his individual capacity; (3) § 1983 Failure to Provide Adequate Medical Care Claim against Sheriff Underwood in his individual capacity; (4) § 1983 Failure to Fund Claim against Walker County; and (5) a state law claim for negligence, wantonness and/or recklessness against Officer Harbin.  (Doc. 15).   Discovery has closed (doc. 47), and the parties have filed multiple motions for summary judgment (docs. 53, 55, 58, 61).  Those motions have been fully briefed and are ripe for review.

For the reasons explained below, Defendant Sheriff Underwood's motion for summary judgment (doc. 53) is **GRANTED IN PART AND DENIED IN PART**; Defendant Nicholas Harbin's motion for summary judgment (doc. 55) is **DENIED**; Defendant Walker County's

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including trial and the entry of final judgment.  (Doc. 11).

motion for summary judgment (doc. 58) is **GRANTED**; and Plaintiff Benton's motion for summary judgment (doc. 61) is **DENIED**.

## I. Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish there is a "genuine issue for trial." *Id.* at 324. (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor). Any factual disputes will be resolved in Plaintiff's favor when sufficient competent evidence supports Plaintiff's version of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276-78 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of the events is supported by insufficient evidence). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat

a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mtn. Park, Ltd. v. Oliver*, 836 F.2d 1560, 1563 (11th Cir. 1989)). Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

The applicable Rule 56 standard is not affected by the filing of cross-motions for summary judgment. *See Gerling Global Reinsurance Corp. of Am. v. Gallagher*, 267 F.3d 1228, 1233 (11th Cir. 2001). Indeed, the Eleventh Circuit has explained that "[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir.1984) (citation omitted).

## II. Summary Judgment Facts

Plaintiff Terry Benton ("Benton") was arrested on July 16, 2015, for failure to register as a sex offender, booked into the Walker County Jail, and assigned to the "B-Dorm." (Doc. 64-1 at 50-56). B-Dorm is a general population dorm that houses pretrial and convicted sex offenders. (Doc. 64-1 at 33 (122:3-8); doc. 62-2 at 23-24 (85:9-86:18); doc. 62-3 at 28 (103:17-105:21)). The individual cells in B-Dorm do not lock, and inmates can move freely throughout the dorm. (*Id.*). Upon arrival, Benton was not assigned a cell, but slept on a mat on the floor in the day room for two weeks until he was "invited" to share a cell. (Doc. 64-1 at 5 (10:19-13:6)).

### A. Conditions at Walker County Jail

Benton testifies that inmates in the jail were known to fashion "homemade" weapons by chipping away at the concrete walls and that he observed fights in the jail that resulted in serious injury. (Doc. 64-1 at 7-8, 32 (21:25-22:21, 120:10-19)). Although Sheriff Underwood was aware

that inmates fought routinely, there was no procedure for keeping track of the number of inmate fights or their severity. (Doc. 62-2 at 17-18 (59:7-63:10)). Sheriff Underwood was unaware of whether jail staff disciplined inmates for fighting. (*Id.* at 30 (112:12-113:16)).

Prior to Sheriff Underwood taking office, in 1995,[2] Walker County entered into a federal consent decree, requiring the jail to meet certain minimal operational standards. (Doc. 62-3 at 7, 9 (21:1-5, 26:10-28:14)); *see Terrell v. Herring*, CV 93-B-2690-J. Finding compliance, the Court terminated the Consent Order in 2006. *See Terrell v. Herring*, CV 93-B-2690-J at doc. 83.

Under the Consent Decree, to be minimally staffed, there was supposed to be at least fourteen officers assigned to each shift to ensure the safe operation of the jail. (Doc. 62-3 at 13-14 (44:2-15, 46:12-48:21)). During the relevant time period, it was the Sheriff's practice to have five to seven officers on shift. (*Id.*). When there were five officers on duty, three officers were locked in stationary positions – central control, pod control, and booking, leaving only one officer to attend to the mail dorms and one officer for the female dorms. (*Id.*).

Sheriff Underwood testified that he has never been able to fully staff the jail and that inadequate staffing compromises the ability of the officers to respond to problems and effectively monitor inmates, which could create a dangerous environment where fights are more likely to occur. (Doc. 62-2 at 16-17 (56:24-59:6)). Sheriff Underwood further testified that he cannot hire more staff because the Walker County Commission would not approve his requests to do so. (*Id.* at 20-21 (73:5-74:17)).

In 2014, following reports that inmates had escaped, by going to the post-office across the street to pick up contraband and returning without detection, the Jail Administrator Trent

---

[2] Although the parties provide 1993 as the year the consent decree was adopted, court records indicate the consent order was adopted on March 16, 1995. *See Terrell v. Herring*, CV 93-B-2690-J at docs. 50 & 83.

McCluskey gave an interview to a news reporter and stated that the jail was ill-equipped with inferior door locks; the perimeter fence was held together with clothes hangers and had requested thirty-three additional security cameras and more lighting. (Doc. 62-3 at 11-12 (35:17-38:21)). McCluskey informed Sheriff Underwood and the County Commission that the video surveillance system was "very inadequate" and needed to be upgraded with at least thirty-three additional cameras to ensure the safety of inmates and the correctional officers. (*Id.* at 22-24 (80:1-86:1)). McCluskey also testified that if an inmate assault occurred in one of these thirty-three blind spots, the guards would not learn about it until afterwards. (*Id.*).

On August 5, 2015, Sheriff Underwood sent the County Commission a letter explaining the jail was in need of repair and requesting an additional $735,000.00 to make repairs and improvements to the jail, based on a recommendation from an outside consulting company. (Doc. 62-2 at 7 (19:19-20:1); doc. 63-6 at 2-20). Sheriff Underwood did not receive a response from the County Commission, who, instead, cut his budget four out of five consecutive years by four to five percent each year. (Doc. 62-2 at 15 (51:6-52:10)).

The capacity at Walker County Jail is 278 inmates. (Doc. 62-2 at 16 (54:15-55:8)). On August 17, 2015, the jail was near capacity with 273 inmates. (Doc. 63-3 at 2).

**B. Harbin's Employment**

Former Sheriff Tirey hired Nicholas Harbin as a correctional officer in 2006. (Doc. 63-1 at 5 (11:7-19)). Prior to working at Walker County Jail, Harbin had no experience as a correctional officer and received two weeks training at Jail School in Selma, Alabama. (*Id.*). Harbin does not establish policy or procedure for the jail. (*Id.* at 6 (16:19-24)). Sheriff Underwood was the chief policy maker for the jail; he was responsible for making sure the jail had written policies and procedures, that the jail staff was trained, and that the policies and procedures were being followed

and enforced. (Doc. 62-2 at 8-9 (23:9-26:2)).

**C. The August 17, 2015 Lunch Tray Incident and Punishment**

On August 17, 2015, Harbin was working the day shift as a "rover." (Doc. 63-1 at 11-12 (37:22-38:25)). Harbin's duties that day included feeding the inmates. (*Id.*). Harbin began feeding inmates lunch at 10:28 AM. (Doc. 63-1 at 31). Harbin obtained a head count, and Benton got in line to receive his tray of food. (Doc. 64-1 at 8 (23:4-24:13)). Benton placed his food tray under the table, got back in the food line, and got a second tray of food from the jail trustee helping Harbin. (*Id.*). Although the practice is one food tray per inmate, there is no official rule as to how many food trays an inmate can have. (Doc. 63-2 at 18 (66:15-67:19)). And, it was common for inmates to try to trick the guards into receiving an extra tray. (*Id.* at 12 (41:3-13)). In fact, Harbin had been counseled by his supervisor regarding the proper procedure for dispensing food trays. (*Id.* at 11 (39:39:11-40:16)). In the past, when he had run out of food trays, presumably because an inmate had taken more than one, Harbin had not wanted to give the remaining inmates any food. (*Id.*). He was counseled that any inmate taking more than one tray was his (Harbin's) fault, and he had to feed all the inmates. (*Id.*).

On August 17, 2015, when Harbin realized an extra tray had been handed out, he entered the dorm, shut the door, and demanded to know who took it. (Doc. 64-1 at 8 (24:17-25:5)). When no one answered, Harbin radioed the officer in central command (i.e., the "cube officer") and instructed him to turn off B-Dorm's phones, kiosk, and to allow no store or visitation privileges, and then he left the dorm. (*Id.* at 9 (26:16-27:2)). Harbin testified that he knew by punishing the entire dorm, it would make the other inmates angry and ferret-out the person who caused the privileges to be revoked. (Doc. 63-1 at 14 (48:9-50:1)). Harbin also stated that he believed group punishment was an effective tool for controlling inmate behavior because the inmates have their

own way of taking care of the inmate who caused their privileges to be revoked. (*Id.*). McCluskey testified that it was Sheriff Underwood's routine practice to allow group punishment by revoking privileges for an entire dorm without due process. (Doc. 62-3 at 41-43 (157:11-163:11)). Sheriff Underwood was also aware that use of such group punishment without due process could create dangerous conditions for the individual who caused the loss of privileges because inmates have their own system of justice. (Doc. 62-2 at 25 (91:2-93:5)).

B-Dorm inmates discovered that the phones and kiosk had been turned off and began to threaten Benton that they would beat and kill him for having lost their privileges. (Doc. 64-1 at 9, 25 (27:3-28:2, 95:5-25)). Afraid for his safety, Benton push the emergency call button and the cube officer opened the locks to let Benton out of the dorm. (*Id.*). As Benton exited the dorm, Harbin approached him in the corridor and saw the other inmates in the dorm beating on the glass, slamming their cell doors, and yelling "get that bitch out of here; we're going to beat that bitch's ass." (*Id.* (28:4-29:18,95:5-15)). Benton asked Harbin to take him into protective custody. (*Id.*). Appearing to know the answer, Harbin asked Benton what he did to "piss off" the other inmates, and Benton admitted to taking the extra food tray. (*Id.* at 9-10, 25 (29:19-30:3, 95:17-21)). Benton told Harbin the other inmates wanted to kill him because Harbin had taken away their privileges. (*Id.*). Harbin told Benton that it would not have been such a big deal if he had spoken up sooner, and they would not be having a problem right now. (Doc. 63-1 at 18 (65:9-21)).

Harbin moved Benton to protective custody in M-Dorm for his safety. (Doc. 64-1 at 10 (30:5-20)). A supervisor told Harbin that he would have to complete paperwork for Benton to remain in protective custody. (Doc. 63-1. at 15 (50:2-51:12)). Rather than complete a report, Harbin decided to return Benton to B-Dorm. (*Id.*). About an hour after having been placed in protective custody, Harbin returned to Benton's cell and told Benton to get his stuff because he

was taking him back to B-Dorm. (Doc. 64-1 at 10 (31:12-32:16); doc. 63-1 at 19 (66:4-12)). Benton told Harbin he couldn't go back to B-Dorm because he was in danger of being attacked. (Doc. 64-1 at 10 (31:12-32:16)). Harbin responded that "[Benton] tried the wrong damn officer on the wrong fucking day" and that he was "not one of these rookies that just started working here. . . . It don't feel good now does it." (Doc. 64-1 at 10 (32:17-33:3); doc. 63-1 at 19 (13:67:21)).

### D. The August 17, 2015 Assault and Response

Within five minutes of having been returned to B-Dorm, Benton was attacked by five other inmates, beaten, and struck in the face with a chunk of concrete wall. (Doc. 64-1 at 11, 32 (34:1-35:21, 120:2-121:2), doc. 63-1 at 31). According to Benton, upon returning to B-Dorm, another inmate named William Scruggs asked who he told on to get back in there. (Doc. 64-1 at 11 (34:1-25)). Benton told Scruggs he didn't tell on anyone, and Scruggs told him that he didn't want Benton in B-Dorm anyway. (*Id.*). According to Benton, Scruggs and other inmates started swinging at him and kicking him. (*Id.* (34:21-35:14)).

Harbin called a "code blue" (inmates fighting) over the radio and took the injured Benton to booking for medical observation. (Doc. 63-1 at 17, 31 (60:19-61:5)). Benton received injuries to the nose and mouth and was "bleeding pretty bad." (Doc. 64-1 at 11 (36:1-37:6). Officers took Benton to a shower to wash off, clothing and all, then back to the booking room where he laid on the concrete floor. (*Id.*). Officers gave Benton two tampons (to stop the bleeding in his nose). (*Id.*). With pain in his ribs, nose, and tooth, and with his eyes swollen shut, Benton spent the night in the booking room. (*Id.* 37:8-25).

A representative of the jail medical staff, jail nurse Roger Childers, saw Benton the next morning. (Doc. 64-1 at 11 (37:8-25)). Childers told Benton he couldn't do much for a broken nose and offered Advil. (*Id.*). Equipment was brought to the jail to perform x-rays on Benton's

face, and the radiologist determined there were no broken bones.  (*Id.* at 12 (38:6-13, 22)).

### E.  Walker County Jail Medical Care

Childers is a registered nurse and principal owner of Preemptive Forensic Health Solutions, LLC ("PFHS"), the entity that contracts with Walker County Commission to triage inmates' health care needs and provide basic medical services.  (Doc. 63-4 at 7; doc. 63-5 at 2-7).  PFHS controlled the triage process and thus could restrict inmates' access to medical care and reduce the associated cost to the County Commission.  (Doc. 63-4 at 7).  Walker County Commission did not appoint a health care authority to create health care policy and procedures for the jail.  (Doc. 63-4 at 7).  Sheriff Underwood delegated decisions pertaining to appropriate health care for inmates to nurse Childers, who determined whether a nurse practitioner or medical doctor needed to be brought in, who would be hired and paid by Childers' company on a case by case basis.  (Doc. 62-3 at 19 (68:5-69:8); doc. 62-2 at 16 (55:20-56:7); doc. 63-4 at 7).

The jail did not keep medical records, and there was no physician oversight of the medical care provided to inmates at the Walker County Jail.  (Doc. 63-4 at 7-8).   There was no medical authority other than PHFS to supervise, inspect, and verify that appropriate care was being provided.  (*Id.*).

### F.  Additional Medical Care

On August 21, 2015, Benton requested to see a doctor about his continued complaints regarding his injured nose and ribs hurting.  (Doc. 64-1 at 12 (39:4-19)).   Thus, four days after the assault, Benton was taken to Walker Baptist Hospital and examined by Thomas Deitz, a nurse practitioner, who noted Benton was in moderate pain and diagnosed a facial injury that consisted of abrasions to his face, bruising, and a torn nasal septum.  (Doc. 63-7 at 10-12 (30:1-41:23), 13-14 (45:19-47:24)).  The overlaying layers of tissue of Benton's nasal septum were compromised

and the cartilage was disrupted. (*Id.*). Benton was prescribed Afrin for his nosebleeds, Naprosyn Sodium for his pain, and Bactroban and Bactrim (antibiotics) for his open wounds. (*Id.* at 44). The Bactrim was prescribed as a preventative measure because Benton was at an increased risk of infection, such as MRSA,[3] since he was in prison. (*Id.* at 13 (43:13-24)). He was directed to follow-up with an ear, nose, and throat specialist within three days. (*Id.* at 14 (47:9-16); doc. 63-7 at 39).

When Benton returned to the jail, his hospital records and prescriptions were given to officers, who gave them to Childers. (Doc. 64-1 at 33-34 (125:19-127:2); doc. 62-3 at 21 (74:17-75:3)). Walker County Jail's policy was for Childers' and his staff to fill and dispense prescription medication to inmates. (Doc. 62-2 at 31 (116:25-117:14); doc. 62-3 at 18, 21-22 (63:3-13, 74:19-78:8)). The Sheriff was responsible for ensuring Childers and his staff complied with these policies pertaining to the provision of medical care and prescription medication; yet, there was no policy or practice in place to ensure inmates received medication prescribed by their physicians. (*Id.*). When inmates complained about not receiving medical care, which they did regularly, Sheriff Underwood would forward their complaints to Childers. (Doc. 62-2 at 32-33 (120:21-122:10); 62-3 at 17 (59:23-61:23)). When Benton did not receive his prescribed medication or his follow-up visit with an ENT, on September 2, 2015, Benton filed a medical request with jail staff. (Doc. 62-2 at 32-34 (121:21-126:12), 54-56. As his wounds continued to ooze, his face became swollen and his nose continued to bleed, there is no indication Benton received anything other than Naprosyn for his pain. (*Id.*; doc. 64-1 at 13 (44:22-46:7)).

On September 15, 2015, Benton was released from the Walker County Jail on his own recognizance and transferred to the Fayette County Jail. (Doc. 53-1 at 13 (45:12-21)). At no time

---

[3] MRSA is methicillin-resistant Staphylococcus aureus, an antibiotic-resistant bacterium.

during his confinement at Walker County Jail in July, August, and September 2015, did Benton communicate with Sheriff Underwood. (*Id.* at 19-20 (68:3-7, 69:20-25, 70:1-5)).

On September 22, 2015, Walker County paid Pegasus Emergency Group of Troy, Alabama, $ 1,729.00, for the care provided to Benton. (Doc. 59-1 at ¶ 7 & p.9). Any direct payment to Walker Baptist Hospital or the x-ray provider, MobileXUSA, would have been regularly billed to Walker County with services provided to other inmates included on one invoice. (*Id.* at ¶ 8).

After being seen by the Fayette County Jail physician Dr. Magourik on October 9, 2015, on October 10, 2015, the Fayette County Sheriff's Office took Benton to the emergency room at DCH-Fayette, complaining of facial swelling for the previous three days. He was diagnosed with cellulitis and prescribed Bactoban, Bactrim, and Ibuprofen; Benton also received a Ketrolac shot to treat the infection that had developed in his face. (Doc. 63-9 at 2-15). On October 12, 2015, Benton's condition appeared worse. He was again seen by Dr. Magouirk, who referred him to DCH, where he was admitted for antibiotic treatment. (Doc. 64-1 at 14 (46:9-47:24)). Benton remained in the hospital for three days, where he was treated for facial cellulitis and an abscess to the left side of his face and lips, which grew MRSA (Methicilli-resistant Staphylococcus aureus). (Doc. 63-9 at 20-47, 49). He was prescribed IV antibiotics, oral antibiotics, and morphine, then discharged on October 15, 2015, when his symptoms resolved. (*Id.*).

Because Benton had filed criminal assault charges against the inmates who attacked him, on November 17, 2015, Benton was transported to the Walker County Jail. (Doc. 76-1 at 20 (70:18-72:9)). At some point between November 21, 2015, Benton filed a grievance with Sheriff Underwood concerning the August 17, 2015 attack and lack of medical care he received afterwards. (Doc. 56-3 at 39-40 (144:11-147:3)). On December 23, 2015, Sheriff Underwood

notified Harbin that he intended to suspend Harbin for five days without pay for four incidents, including the one included in Benton's grievance. (Doc. 62-2 at 27 (98:13-22)). Harbin did not dispute he committed the wrongs, agreed to the suspension, and admitted he had an "explosive temper." (Doc. 62-3 at 39-40 (148:6-150:21), 80-83).

### G. Walker County Commission

The fiscal year of the Walker County Commission runs from October 1 through September 30 of the immediately following year, meaning the 2014-2015 fiscal year ran from October 1, 2014 through September 30, 2015. (Doc. 59-1 at ¶ 3). Benton's assault occurred on August 17, 2015, during the 2014-2015 Walker County fiscal year. During fiscal year 2014-2015, Walker County paid Preemptive Forensic Health Solutions ("PFHS") for onsite medical care and treatment of inmates at the Walker County Jail, and for those services, Walker County paid PFHS $ 15,120.00 per month. (*Id.* at ¶ 5). For fiscal year 2014-2015, Walker County paid a total of $ 544,513.73, for inmate health care and medications. (*Id.* at ¶ 5). This total includes not only payments for PFHS, but also for any care provided to an inmate that the inmate did not have funds or resources to pay for, which specifically includes care and treatment at emergency rooms, hospitals, and physician's offices, having prescription medications filled, and having x-rays performed, whether at the jail or at an offsite facility or office. (*Id.*). Such medical examinations, care, or treatment, or any medication or x-ray did not require any preapproval by Walker County (or its Commission). (*Id.* at ¶ 9). Except for payments scheduled by contract, Walker County was billed after the service or medication was provided. (*Id.*).

The Sheriff, jail administrator, and jail staff coordinated with the onsite medical provider for any offsite treatment that was needed for an inmate. (Doc. 56-3 at 48 (180:3-21)). Similarly, any follow-up or further medical care or treatment at an offsite location was coordinated with and

handled by jail staff.  (*Id.* at 48-49 (180:22-181:13)).

### III. Analysis

#### A. Defendant Walker County

Benton asserts one claim against Walker County, alleging that the County failed to adequately fund inmate medical care at the Walker County Jail.  The Supreme Court has recognized that inmates must rely on prison authorities to treat their medical needs. *Harris v. Thigpen*, 941 F.2d 1495, 1504 (11th Cir. 1991) (quoting *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)).  Thus, federal and state governments are constitutionally required to provide minimally adequate medical care to those whom are incarcerated.  *Id.*  Lack of funds cannot justify an unconstitutional lack of competent medical care and treatment.  *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 705 (11th Cir. 1985).

However, Alabama counties have only the powers delegated to them by the legislature. *Shaw v. Coosa Cnty. Comm.*, 330 F. Supp. 2d 1285, 1288 (M.D. Ala. 2004) (citing *Turquitt v. Jefferson Cnty., Ala.*, 137 F.3d 1285, 1289 (11th Cir. 1998)).  Alabama counties have no role in operating, administering, or overseeing jails.  *Pettus v. Hill*, Case No. CV 05-B-2496-NE, 2008 WL 11425363, at *7-8 (N.D. Ala. Mar. 31, 2008) (citing ALA. CODE § 11-14-10).  Rather, in Alabama, the sheriff "has legal custody and charge of the jail in his county and all prisoners committed thereto. . . . "  ALA. CODE § 14-6-1 (1975).  Sheriffs have full responsibility for daily management of the jails, including inmate supervision, and they are not subject to county oversight in their performance of this responsibility. *Turquitt*, 137 F.3d at 1289. The Alabama Department of Corrections, a state agency, oversees the county jails and has the authority to regulate and inspect them to aid in securing just, humane, and economic management.  *Id.*

Alabama counties do possess some duties with respect to county jails; however, none of

these duties "relates to the daily operation of the jails or to the supervision of inmates." *Turquitt*, 137 F.3d at 1289. "The duties of the counties with respect to the jails are limited to funding the operation of the jail and providing facilities to house the jail." *Id.* Specifically, Alabama Code § 14-6-19 provides, in pertinent part, that "[t]he sheriff of a county shall provide to prisoners ***at the expense of the county***, all of the following . . . [n]ecessary medicine and medical attention to those prisoners who are sick or injured, when they are unable to provide them for themselves." (emphasis added). Thus, Alabama law places a duty on the county to fund the medical care described in the statute. *See Shaw v. Coosa Cnty. Commission*, 330 F. Supp. 2d 1285, 1288-89 (N.D. Ala. 2004).

Benton's sole claim against Walker County is a § 1983 claim for failure to fund, alleging that Walker County "caused or contributed" to the medical customs and policies at Walker County Jail "by not providing adequate funds for medical treatment for the prisoners in its custody and in other ways, by encouraging a culture where saving money was encouraged over the protections of inmates' constitutional rights." (Doc. 3-3 at 22, ¶ 85). Benton has not shown that Walker County (nor its County Commission) failed to adequately fund inmate medical care and treatment in Fiscal Year 2014-2015, specifically for August 2015. The undisputed evidence demonstrates Walker County paid for onsite medical care by PFHS, paid for inmates' x-rays, paid for inmates' offsite medical care and treatment at the hospital and physicians' offices, and paid for prescription medications – totaling $ 544,513.74 that year. (Doc. 59-1 at ¶ 5).

It appears Benton takes issue with the medical care he received from the onsite provider, but there is no evidence that any medical evaluation, treatment, care, or prescription medication was "restricted" or not provided due to lack of funding from Walker County. Decisions regarding Benton's medical care were made by jail staff, and Walker County did not have to approve any

such medical care or medications. Furthermore, while Walker County made scheduled payments to PFHS, Walker County could have been billed for additional medical services and medication after they were provided. There is no evidence to support Benton's claim against Walker County for failure to fund. Walker County's motion for summary judgment (doc. 58) will be **GRANTED**, and the single failure to fund claim against Walker County will be **DISMISSED**.[4]

### B. Defendant Officer Harbin

Benton assertions a § 1983 claim for failure to protect against Office Harbin, as well as state law claims for negligence, wantonness, and/or recklessness. (*See* doc. 15).

#### 1. Failure to Protect

Failure to protect claims are analyzed under the Eighth Amendment deliberate indifference standard. *Farmer v. Brennan*, 511 U.S. 825, 823-33 (1994). Technically, claims brought by a pretrial detainee, "are considered under the Due Process Clause of the Fourteenth Amendment, which prohibits the imposition of punishment on those who have not yet been convicted of a crime, whereas the Eighth Amendment's prohibition against cruel and unusual punishment governs claims of convicted inmates. . . ." *Smith v. Terry*, 2:13-cv-216-WHA, 2016 WL 4942066, at *2 (M.D. Ala. Aug. 15, 2016) (citations and internal quotations omitted). "As to these claims, the Eleventh Circuit has long held that the applicable standard is the same, so decisional law involving prison inmates applies equally to cases involving arrestees or pretrial detainees." *Id.* The standard for deliberate indifference requires the plaintiff to produce sufficient evidence that (1) the defendant knew of and disregarded "an excessive risk to inmate health or safety;" (2) the defendant was "aware of facts from which the inference could be drawn that a substantial risk of serious harm

---

[4] Accordingly, Benton's motion for summary judgment (doc. 61) is due to be **DENIED** as to this claim against Walker County.

exist[ed];" and (3) the defendant must also draw that inference." *Farmer*, 511 U.S. at 837. The condition must be "extreme" such that there is a "strong likelihood of injury, rather than a mere possibility, before an official's failure to act can constitute deliberate indifference." *Estate of Owens v. GEO Group, Inc.*, 660 Fed. Appx. 763, 767 (11th Cir. 2016). "[T]he deliberate indifference standard—and the subjective awareness required by it—is far more onerous than normal tort-based standards of conduct sounding in negligence: 'Merely negligent failure to protect an inmate from attack does not justify liability under [§] 1983.'" *Goodman v. Kimbrough*, 718 F.3d 1325, 1332 (11th Cir. 2013) (quoting *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990)).

In support of his motion for summary judgment, Harbin argues Benton cannot prove his failure to protect claim because Harbin was not aware of a substantial risk of serious harm existed. (Doc. 56 at 9-15). First, Harbin argues the assault occurred not because of the loss of privileges, but because Benton was an informant, which he didn't know anything about. (Doc. 56 at 10). Next, Harbin argues that, although Benton was at a substantial risk of serious harm when privileges were revoked, that risk was abated when privileges were restored, and he could not have anticipated Benton was still at risk. (*Id.* at 13).

Sufficient evidence has been presented to create a genuine issue as to whether Officer Harbin was subjectively aware Benton was at a serious risk of substantial harm when he returned him to B-Dorm after revoking all of B-Dorm's privileges. The question of "[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact," and such knowledge may be inferred based on the obviousness of the risk." *Farmer*, 511 U.S. at 842, 844-45; *Bugge v. Roberts*, 430 Fed. Appx. 753, 758 (11th Cir. 2011). After Harbin instructed the cube officer to turn off the phones, B-Dorm inmates discovered that the phones and kiosk had been turned off and

begun to threaten Benton that they would beat and kill him for having lost their privileges. (Doc. 64-1 at 9, 25 (27:3-28:2, 95:5-25)). This was not some unsurprising turn of events. Harbin testified that he knew by punishing the entire dorm, it would make the other inmates angry and ferret-out the person who caused the privileges to be revoked. (Doc. 63-1 at 14 (48:9-50:1)). Harbin also stated that he believed group punishment was an effective tool for controlling inmate behavior because the inmates have their own way of taking care of the inmate who caused their privileges to be revoked. (*Id.*).

Although Harbin moved Benton into protective custody for about an hour, the evidence demonstrates that a supervisor told Harbin that he would have to complete paperwork for Benton to remain in protective custody. (Doc. 63-1. at 15 (50:2-51:12)). Rather than complete a report, Harbin decided to return Benton to B-Dorm. (*Id.*). Benton told Harbin he couldn't go back to B-Dorm because he was in danger of being attacked. (Doc. 64-1 at 10 (31:12-32:16)). Harbin responded that "[Benton] tried the wrong damn officer on the wrong fucking day" and that he was "not one of these rookies that just started working here. . . . It don't feel good now does it." (Doc. 64-1 at 10 (32:17-33:3); doc. 63-1 at 19 (13:67:21)). This evidence supports Benton's claim that Harbin remained aware of the specific, continued threat against his safety and returned Benton to B-Dorm where the other inmates were waiting to enact their revenge.

### 2. Qualified Immunity

The doctrine of qualified immunity protects government officers when they are sued in their individual capacities from liability for civil damages so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). An officer will be entitled to qualified immunity if his actions were

objectively reasonable, that is if an objectively reasonable officer in the same situation could have believed that his actions were lawful based on the law clearly established at the time. *Id.* (citing *Anderson v. Creighton*, 483 U.S. 635, 638-41 (1987)). "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." *Id.* (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks and citations omitted).

There is no dispute that Officer Harbin, a public official, was acting within the scope of his discretionary authority at the time he allegedly violated Benton's constitutional rights. The parties disagree as to whether Harbin's actions "violated clearly established law." Qualified immunity will not apply if Harbin's conduct violated such clearly established law, meaning "a reasonable public officer would not have believed his actions to be lawful in light of law that was clearly established at the time of the purposed violation. *Anderson v. Creighton*, 438 U.S. 635, 641 (1987); *Johnson v. Clifton*, 74 F.3d 1087, 1091 (11th Cir. 1996).

Relevant case law establishes that, beyond restraining prison officials from inflicting "cruel and unusual punishment," the Constitution imposes duties on these officials, who must "take reasonable measures to guarantee the safety of the inmates." *Bowen v. Warden, Baldwin State Prison*, 826 F.2d 1312, 1319-20 (11th Cir. 2016) (quoting *Farmer*, 511 U.S. 825, 832). The Supreme Court has made clear that "prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." *Id.* at 833. Here, the evidence shows that, although Harbin briefly removed Benton from B-Dorm to protective custody, he subsequently returned him to B-Dorm instead of filling out paperwork to transfer him to protective custody. (Doc. 63-1. at 15 (50:2-51:12)). Harbin's argument that any risk or threat had abated is belied by the record. To

the contrary, Harbin's testimony shows that he returned Benton to B-Dorm knowing the inmates would handle the problem their own way. Harbin is not entitled to qualified immunity on Benton's failure to protect claim because Benton's rights were clearly established at the time of the violation.

### 3. Immunity as to State Law Claims Against Harbin

Harbin contends he is shielded from liability as to Benton's state law claims under several different theories, including sovereign immunity pursuant to Article I, § 14 of the Alabama Constitution; the Alabama Jailer's Act as codified in Alabama Code §§ 36-22-3(b) and 14-6-1; as well as State Agent and Discretionary Function Immunity. (Doc. 56 at 21-26).

### a. Sovereign Immunity

The Alabama Constitution provides for sovereign immunity in Article I, § 14, which states "the State of Alabama shall never be made a defendant in any court of law or equity." Sovereign immunity extends to Alabama sheriffs "when they are executing their law enforcement duties." *McMillian v. Monroe Cnty, Ala.*, 520 U.S. 781, 793 (1997). Deputy sheriffs are also immune to suit to the same extent as a sheriff because "the deputy sheriff is the alter ego of the sheriff." *Hereford v. Jefferson Cnty.*, 586 So. 2d 209, 210 (Ala. 1991). However, jailers working for a sheriff's office "cannot properly be viewed in legal contemplation as an extension of the sheriff or as one officer with the sheriff." *Ex parte Shelley*, 53 So. 3d 887, 898 (Ala. 2009). Thus, the Alabama Constitution does not provide immunity from suits against jailers such as Officer Harbin in their individual capacities for money damages. *See id.*; *see also Young v. Myhrer*, 243 F. Supp. 3d 1243, 1252-53 (N.D. Ala. 2017). Officer Harbin is not entitled to the sovereign immunity provided in Article I, § 14 of the Alabama Constitution.

### b. The Alabama Jailer Liability Protection Act

In June 2011, the Alabama Legislature enacted the Jailer Liability Protection Act, which

amended Alabama Code §§ 14-6-1 and 36-22-3 to provide immunity for jail personnel. *See Young*,

243 F. Supp. 3d at 1253. Alabama Code § 14-6-1 now reads as follows:

> The sheriff has the legal custody and charge of the jail in his or her county and all prisoners committed thereto, except in cases otherwise provided by law. The sheriff may employ persons to carry out his or her duty to operate the jail and supervise the inmates housed therein for whose acts he or she is civilly responsible. Persons so employed by the sheriff shall be acting for and under the direction and supervision of the sheriff and shall be entitled to the same immunities and legal protections granted to the sheriff under the general laws and the Constitution of Alabama of 1901, ***as long as such persons are acting within the line and scope of their duties and are acting in compliance with the law***.

ALA. CODE § 14-6-1. (emphasis added). The related statutory counterpart provides as follows:

> Any of the duties of the sheriff set out in subsection (a) or as otherwise provided by law may be carried out by deputies, reserve deputies, and persons employed as authorized in Section 14–6–1 as determined appropriate by the sheriff in accordance with state law. Persons undertaking such duties for and under the direction and supervision of the sheriff shall be entitled to the same immunities and legal protections granted to the sheriff under the general laws and the Constitution of Alabama of 1901, ***as long as he or she is acting within the line and scope of his or her duties and is acting in compliance with the law***.

ALA. CODE § 36-22-3(b). (emphasis added).

Whether Harbin is entitled to such protection from liability depends on if he was "acting within the line and scope of his . . . duties" and whether he was "acting in compliance with the law." *See id.* While there does not appear to be direct guidance from the Alabama Supreme Court or the Eleventh Circuit on the meaning of this language, several district courts have addressed this issue, and the courts agree that the language must mean more than just a restatement of the jailer act's first prong. *See Young*, 243 F. Supp. 3d at 1255. Otherwise, the phrase would be superfluous. Specifically, "acting within the line and scope of one's duty is not enough to guarantee immunity, as immunity is also conditioned on 'acting in compliance with the law.'" *Hobbs v. Powell*, 138 F. Supp. 3d 1328, 1337 (N.D. Ala. 2015).

Harbin cannot satisfy the second prong of the Alabama Jailer Liability Protection Act, that

he was "acting in compliance with the law." There is sufficient evidence to create a genuine issue of material fact as to Benton's failure to protect claim (as explained above) as well as his state law claims.

### c. State Agent Immunity

Harbin also argues he is entitled to state agent immunity as outlined in *Ex parte Cranman*. 792 So. 2d 392, 405 (Ala. 2000). (Doc. 56 at 23-26). In *Cranman*, the Alabama Supreme Court restated the rule governing State agent immunity as follows:

> A State agent shall be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's
>
>> (1) formulating plans, policies, or designs; or
>> (2) exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as:
>>> (a) making administrative adjudications;
>>> (b) allocating resources;
>>> (c) negotiating contracts;
>>> (d) hiring, firing, transferring, assigning, or supervising personnel;
>> or
>>
>> (3) discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; or
>> (4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons; or
>> (5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students.
>
> Notwithstanding anything to the contrary in the foregoing statement of the rule, a State agent shall not be immune from civil liability in his or her personal capacity
>
>> (1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or
>> (2) when the State agent acts willfully, maliciously, fraudulently, in bad

faith, beyond his or her authority, or under a mistaken interpretation of the law.

792 So. 2d at 405. When a party raises the state agent immunity defense, there is a burden-shifting process that must take place. *Ex parte Estate of Reynold*, 946 So. 2d 450, 452 (Ala. 2006) (citing *Giambrone v. Douglas*, 874 So. 2d 1046, 1052 (Ala. 2003)). To claim state agent immunity, a State agent must bear the burden of demonstrating that the plaintiff's claim arising from a function that would entitle the State agent to immunity. *Id.* (citing *Giambrone*, 874 So. 2d at 1052). If the State agent makes such a showing, the burden then shifts to the plaintiff to show that the State agent acted willfully, maliciously, fraudulently, in bad faith, or beyond his authority. *Id.* (citing *Giambrone*, 874 So. 2d at 1052). "A State agent acts beyond authority and is therefore not immune when he or she 'fail[s] to discharge duties pursuant to detailed rules or regulations, such as those stated on a checklist.'" *Id.* (quoting *Giambrone*, 874 So.2d at 1052).

Harbin contends he is entitled to State agent immunity because he was exercising his judgment in the administration of the jail when Benton was injured. (Doc. 79 at 12). Harbin has carried his burden to show that Benton's claim arose from a function that would entitle him to State agent immunity. Harbin was exercising his judgment in the administration of the jail when he decided to institute group punishment and then remove and return Benton. *See Ex parte Dixon*, 55 So. 3d 1171, 1179-80 (Ala. 2010). Thus, the burden shifts to Benton to prevent State agent immunity from shielding Harbin from liability. As outline above, there is evidence that Harbin acted either "willfully, maliciously, fraudulently, or in bad faith," when he returned Benton to B-Dorm. There is evidence that shows Harbin knew group punishment would make the inmates turn on each other. The evidence further shows that, although Harbin removed Benton from what was becoming a violent situation, Harbin returned Benton to B-Dorm when confronted with having to fill out paperwork. Furthermore, Harbin knew that the threat to Benton's safety remained, as

Benton told Harbin he couldn't go back to B-Dorm because he was in danger of being attacked, (doc. 64-1 at 10 (31:12-32:16)), and Harbin responded that "[Benton] tried the wrong damn officer on the wrong fucking day" and that he was "not one of these rookies that just started working here. . . . It don't feel good now does it." (Doc. 64-1 at 10 (32:17-33:3); doc. 63-1 at 19 (13:67:21)). There is sufficient evidence to show Harbin acted willfully and maliciously to prevent State agent immunity from protecting him from liability.

For these reasons, Harbin's motion for summary judgment (doc. 55) is **DENIED**. The failure to protect and state law claims against Harbin will go forward.[5]

## C. Defendant Sheriff Underwood

There are two remaining claims against Sheriff Underwood in his individual capacity: a claim for failure to protect and a claim for failure to provide adequate medical care. (*See* doc. 15).

### 1. Failure to Protect[6]

Failure to protect claims are analyzed under the Eighth Amendment deliberate indifference standard. *Farmer v. Brennan*, 511 U.S. 825, 823-33 (1994). Technically, claims brought by a pretrial detainee, "are considered under the Due Process Clause of the Fourteenth Amendment, which prohibits the imposition of punishment on those who have not yet been convicted of a crime, whereas the Eighth Amendment's prohibition against cruel and unusual punishment governs claims of convicted inmates. . . ." *Smith v. Terry*, 2:13-cv-216-WHA, 2016 WL 4942066, at *2 (M.D. Ala. Aug. 15, 2016) (citations and internal quotations omitted). "As to these claims, the

---

[5] Benton's motion for summary judgment (doc. 61) is also **DENIED** as to the claims asserted against Harbin. While there is evidence to support Benton's claims against Harbin, there are genuine issues of material fact that should be resolved at trial.
[6] To clarify, there is separate claim for violation of Benton's due process rights based on the imposition of group punishment. (*See* doc. 15). Instead, Benton asserts a claim for failure to protect for which the imposition of group punishment is part of the facts.

Eleventh Circuit has long held that the applicable standard is the same, so decisional law involving prison inmates applies equally to cases involving arrestees or pretrial detainees." *Id.* The standard for deliberate indifference requires the plaintiff to produce sufficient evidence that (1) the defendant knew of and disregarded "an excessive risk to inmate health or safety;" (2) the defendant was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed];" and (3) the defendant must also draw that inference." *Farmer*, 511 U.S. at 837. The condition must be "extreme" such that there is a "strong likelihood of injury, rather than a mere possibility, before an official's failure to act can constitute deliberate indifference." *Estate of Owens v. GEO Group, Inc.*, 660 Fed. Appx. 763, 767 (11th Cir. 2016). "[T]he deliberate indifference standard—and the subjective awareness required by it—is far more onerous than normal tort-based standards of conduct sounding in negligence: 'Merely negligent failure to protect an inmate from attack does not justify liability under [§] 1983.'" *Goodman v. Kimbrough*, 718 F.3d 1325, 1332 (11th Cir. 2013) (quoting *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990)).

The standard by which a supervisor, such as the sheriff, can be held liable for the actions of subordinates is "extremely rigorous." *Cottone v. Jenne*, 326 F.3d 1352, 1357 (11th Cir. 2003). Supervisory officials cannot be held liable under § 1983 for unconstitutional acts by their subordinates based on *respondeat superior* or vicarious liability principles. *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999). Instead, when, as here, there are no allegations of personal participation, supervisor liability is permissible only if there is a "causal connection" between a supervisor's actions and the alleged constitutional violation. *Cottone*, 326 F.3d at 1360.

One way a plaintiff can show the requisite causal connection is by demonstrating that a supervisor's policy or custom resulted in "deliberate indifference to constitutional rights."

*Cottone*, 326 F.3d at 1360-61. A plaintiff can also show that the absence of a policy led to a violation of constitutional rights. *Rivas v. Freeman*, 940 F.2d 1491, 1495 (11th Cir. 1991). Either way, though, to prove that a policy or its absence caused a constitutional harm, a plaintiff must point to multiple incidents, *see Rivas*, 940 F.2d at 1495–96, or multiple reports of prior misconduct by a particular employee, *see Danley*, 540 F.3d at 1315. "A single incident of a constitutional violation is insufficient to prove a policy or custom even when the incident involves several [subordinates]." *Craig v. Floyd County*, 643 F.3d 1306, 1312 (11th Cir. 2011).

The evidence includes testimony from Jail Administrator McCluskey that it was Sheriff Underwood's routine practice to allow group punishment by revoking privileges for an entire dorm without due process. (Doc. 62-3 at 41-43 (157:11-163:11)). There is also evidence that Sheriff Underwood was aware that use of group punishment could create dangerous conditions for the individual who caused the loss of privileges because inmates have their own system of justice. (Doc. 62-2 at 25 (91:2-93:5)). Furthermore, although Sheriff Underwood was aware that inmates fought routinely, there was no procedure for keeping track of the number of inmate fights or their severity. (Doc. 62-2 at 17-18 (59:7-63:10)). Sheriff Underwood was also unaware if jail staff disciplined inmates for fighting. (*Id*. at 30 (112:12-113:16)).

Benton has presented sufficient evidence to create a genuine issue of material fact as to supervisor liability for failure to protect against Sheriff Underwood. The evidence shows that Sheriff Underwood allowed for the use of group punishment in Walker County Jail without implementing policies or regulations to protect inmates from retaliatory violence that he knew could result. For these reasons, Sheriff's Underwood's motion for summary judgment (doc. 53) is

**DENIED** as to Benton's claim for failure to protect.[7]

### 2. Qualified Immunity

As explained above, the doctrine of qualified immunity protects government officers when they are sued in their individual capacities from liability for civil damages so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Sheriff Underwood asserts he is entitled to qualified immunity. (Doc. 53 at 17-20).

To invoke qualified immunity, Sheriff Underwood must first establish that he was acting within the scope of his discretionary authority when the alleged violation occurred. *Townsend v. Jefferson Cnty.*, 601 F.3d 1152, 1158 (11th Cir. 2010). Since the evidence shows Sheriff Underwood was engaged in a discretionary function – establishing policies for jail supervision, the burden shifts to Benton to show Sheriff Underwood is not entitled to qualified immunity. *Id.* (citing *Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004)). Specifically, Benton must demonstrate that (1) Sheriff Underwood violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation. *Id.* (citing *Holloman*, 370 F.3d at 1264).

Beyond just restraining prison officials from inflicting "cruel and unusual punishments" upon inmates, the Constitution "imposes duties on these officials, who must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Thus, "prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." *Id.* at 833. While every injury caused at the hands of other inmate is not actionable,

---

[7] Benton's motion for summary judgment (doc. 61) is also **DENIED** as to his claim for failure to protect because there are questions of fact regarding the causal connection element.

there is a constitutional violation "when a substantial risk of serious harm, of which the official is subjectively aware, exists and the official does not respond reasonably to the risk." *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014). As noted above, Harbin is not entitled to qualified immunity on Benton's failure to protect claim because Benton's rights were clearly established at the time of the violation. Sheriff Underwood nevertheless was aware that use of group punishment could create dangerous conditions for the individual who caused the loss of privileges because inmates have their own system of justice. (Doc. 62-2 at 25 (91:2-93:5)). And, although Sheriff Underwood was aware that inmates fought routinely, he instituted no procedure for keeping track of the number of inmate fights or their severity. (Doc. 62-2 at 17-18 (59:7-63:10)). Sheriff Underwood was also unaware if jail staff disciplined inmates for fighting. (*Id*. at 30 (112:12-113:16)). Although there was a clearly established right for inmates to be protected from violence from other inmates, Sheriff Underwood failed to develop any policies to prevent situations like the one that occurred here. There is no evidence to support qualified immunity as to Benton's failure to protect claim against Sheriff Underwood.

### 3. Failure to Provide Adequate Medical Care

Generally, to establish liability under § 1983 for inadequate medical treatment, a prisoner must demonstrate that the failure to provide him medical care amounted to cruel and unusual punishment under the Eighth Amendment to the United States Constitution. *Estelle v. Gamble*, 429 U.S. 97 (1976). Because Benton was a pre-trial detainee and pretrial detainees are not subject to punishment, Benton's protections arise under the Due Process Clause of the Fourteenth Amendment rather than the Eighth Amendment. *See Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979). "[T]he minimum standard for providing medical care to a pre-trial detainee under the Fourteenth Amendment is the same as the minimum standard required by the Eighth Amendment

for a convicted prisoner; both the right to due process and the right to be free from cruel and unusual punishment are violated by a government official's deliberate indifference to serious medical needs." *See Lancaster v. Monroe Cty., Ala.*, 116 F.3d 1419, 1425 n.6 (11th Cir. 1997) (citing *Hamm v. DeKalb Cnty.*, 774 F.2d 1567, 1573-74 (11th Cir. 1985)), *overruled on other grounds by LeFrere v. Quezada*, 588 F.3d 1317, 1318 (11th Cir. 2009). That is, Benton must show his inadequate care arose from "deliberate indifference to [his] serious medical needs." *Estelle*, 429 U.S. at 104. This standard encompasses both objective and subjective components. *Williams v. Limestone Cnty., Ala.*, 198 Fed. Appx. 893, 896 (11th Cir. 2006).

First, a plaintiff must establish an "objectively serious medical need." *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003). A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* (citation and quotation marks omitted). The "medical need must be one that, if left unattended, poses a substantial risk of serious harm." *Id.* (citation and quotation marks omitted). After a plaintiff presents evidence of an objective serious medical need, he must satisfy the subjective element by demonstrating that the prison official acted with deliberate indifference to that need. An official acts with deliberate indifference when the official knows that an inmate is in serious need of medical care but fails or refuses to obtain proper treatment. *Lancaster*, 116 F3d at 1425. To prove deliberate indifference, Benton must show "(1) subjective knowledge of a risk of serious harm [and] (2) disregard of that risk; (3) by conduct that is more than mere negligence." *Farrow*, 320 F.3d at 1245.

Underwood characterizes Benton's injuries has a "bloody nose" and contends Benton's injuries did not constitute a "serious medical need," pointing to testimony from the nurse practitioner who treated Benton at Walker Baptist Hospital as stating the injury could heal on its

own.  (Doc. 53 at 14-15 & doc. 70 at 8).  This is not a complete characterization of Nurse Practitioner Deitz's testimony.  To the contrary, Deitz testified that "you could choose to do nothing and let it heal on its own.  But I – I felt like I couldn't.  I had to treat it. . . .  Because he was in prison. . . .  Because Staph is common in prison."  (Doc. 63-7 at 12 (40:3-15)).  Thus, Deitz's testimony demonstrates that, in his medical opinion, Benton needed treatment because of his living conditions.  (*See id.*).

A "serious medical need" is an injury or condition that a physician has diagnosed as requiring treatment or that "is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Taylor v. Hughes*, 920 F3d 729, 733 (11th Cir. 2019).  To qualify as a "serious medical need," an injury or condition, if not treated, must create a "substantial risk of serious harm."  *Id.*  For example, the Eleventh Circuit has concluded that a freely bleeding cut that created a pool of blood on the ground and required stitches presented a serious medical need.  *Aldridge v. Montgomery*, 753 F.2d 970, 972-73 (11th Cir. 1985) (per curiam).  Broken bones, *see Brown v. Hughes*, 894 F.2d 1533, 1538-39 (11th Cir. 1990) (per curiam), and, depending on the circumstances, severe pain that is not promptly or adequately treated, *McElligott v. Foley*, 182 F.3d 1248, 1255-59 (11th Cir. 1999), can present a serious medical need.  However, mere skin abrasions and bruising do not rise to this level.  *See Hinson v. Bias* 927 F.3d 1103, 1122 (11th Cir. 2019).

Here, Benton was kicked in the face repeatedly by several other inmates.  After the attack, he was "bleeding pretty bad" and his eyes were swollen shut.  ((Doc. 64-1 at 11 (36:1-37:25)).  Four days after the attack, he was still experiencing nose bleeds, and Deitz diagnosed "a nasal septal laceration" and prescribed, Afrin (to dry up the nose bleeds), pain medication, and antibiotics.  (Doc. 63-7 at 35-36).  Benton's injuries sustained during the August 17, 2015 assault

constituted a serious medical need.  Benton's injuries were more than abrasions and bruising.  It is obvious to even a lay person that he needed medical attention and, that if left unattended, he was at a risk of serious harm from continued bleeding and infection.

Next, Benton must prove deliberate indifference.  To prove deliberate indifference, Benton must show "(1) subjective knowledge of a risk of serious harm [and] (2) disregard of that risk; (3) by conduct that is more than mere negligence." *Farrow*, 320 F.3d at 1245.  The evidence shows that immediately after the assault, Benton was cleaned up and given supplies to help stop the bleeding. (Doc. 64-1 at 11 (36:1-37:25)).  Nurse Childers saw Benton the next day.  He offered Benton Advil for his pain and brought in x-ray equipment to determine if there were any broken bones (there were not).  (Doc. 64-1 at 11-12 (37:8-38:22)).  Approximately four days later, when the pain did not subside, Benton was taken to Walker Baptist Hospital, where Deitz prescribed Afrin to stop the nosebleeds, naprosyn sodium for pain, and antibiotics to prevent infection.  (Doc. 63-7 at 10-12 (30:1-41:23), 13-14 (45:19-47:24)).  Deitz also recommended Benton follow-up with an ENT three days later.  (Doc. 63-7 at 39).

When he did not receive the medication or follow-up care Deitz prescribed, on September 2, 2015, Benton filed a medical request with jail staff.  (Doc. 62-2 at 32-24 (121:21-126:12), 54-56).  There is no evidence Benton received his medication, other than Naproxyn for pain, prior to his transfer to Fayette County Jail on September 15, 2015.

The shortcoming in Benton's medical care is that he did not receive the antibiotic Deitz prescribed. It is undisputed that Deitz proscribed the antibiotic prophylactically – as a precautionary measure.  Furthermore, although Benton filled out a medical request form on September 2, 2015, he did not indicate he was not receiving his prescribed antibiotic.  (Doc. 62-2 at 54).  Instead, Benton requested to see the doctor about his "conditions with nose/nasal/sinuses"

and his "thyroids." (*Id.*). Benton also stated he needed to get his "eyes checked." (*Id.*).

Benton alleges Sheriff Underwood was deliberately indifferent to his serious medical needs by having no involvement in the provision of inmate medical care. (*See* doc. 62). While a lack of necessary policies can satisfy the causal connection needed to impose supervisor liability for constitutional deprivations (as discussed above), there is simply no evidence of deliberate indifference in this case. Childers, who is responsible for providing medical care to Walker County Jail inmates on behalf of Sheriff Underwood, initially treated Benton and would have been responsible for his follow-up care. There is no evidence that Nurse Childers had subjective knowledge that Benton needed his antibiotic and that serious harm would result if he did not receive it. Furthermore, even if such subjective knowledge can be inferred for purposes of summary judgment, there is no evidence Childers disregarded that risk by conduct more culpable than mere negligence. Deliberate indifference requires proof of more than gross negligence. *Townsend v. Jefferson Cnty.*, 601 F.3d 1152, 1158 (11th Cir. 2010). There is no such evidence of culpability in this case. For this reason, Sheriff Underwood's motion for summary judgment (doc. 53) is **GRANTED** as to Benton's claim for deliberate indifference.[8]

## IV. Conclusion

For the reasons stated above, Defendant Sheriff Underwood's motion for summary judgment (doc. 53) is **GRANTED IN PART AND DENIED IN PART**; Defendant Nicholas Harbin's motion for summary judgment (doc. 55) is **DENIED**; Defendant Walker County's motion for summary judgment (doc. 58) is **GRANTED**; and Plaintiff Benton's motion for summary judgment (doc. 61) is **DENIED**.

---

[8] Likewise, Benton's motion for summary judgment (doc. 61) is **DENIED** as to his claim for deliberate indifference against Sheriff Underwood.

Because genuine issues of material fact remain, the following claims will go forward: (1) § 1983 Failure to Protect against Officer Harbin; (2) § 1983 Failure to Protect against Sheriff Underwood; and (3) state law claim for negligence, wantonness, and/or recklessness against Officer Harbin.  All claims are against the remaining defendants in their individual capacity.  There are no remaining claims against Walker County.

The parties are encouraged to discuss alternative dispute resolution, including the potential for mediation, and to file a joint status report by **April 7, 2020**, including report their position on whether or not they believe mediation would be beneficial to the resolution of this action.

DONE this 24th day of March, 2020.

_____
**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE